**UNITED STATES of America, Plaintiff,**

v.

**Sherice Y. THOMPSON, Defendant.**

No. 4:CR93–3035.

United States District Court, D. Nebraska.

April 12, 1996.

Thomas J. Monaghan, United States Attorney, Sara E. Fullerton, Special Assistant United States Attorney, Lincoln, NE, for Plaintiff.

Michael Dwyer, Assistant Federal Public Defender, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

I have previously given notice that I believed Sherice Y. Thompson (Thompson) was entitled to the so-called "safety-valve" exception under 18 U.S.C. § 3553(f)(1)–(5) and that I intended to depart downward under U.S.S.G. § 5K2.0, p.s. *United States v. Thompson,* 905 F.Supp. 676 (D.Neb.1995). The government objected (Filing 487), arguing that Thompson was not entitled to application of the "safety-valve" exception, and further, that I should not depart downward.

An extensive evidentiary hearing was held. Subsequent to the evidentiary hearing Thompson offered to be interviewed yet a fourth time by law enforcement officers. The government accepted her offer, and has now withdrawn the objection to application of the "safety-valve" exception (Filing 553). But the government also contends that nothing about Thompson or her case justifies a departure by the court.

Initially, given the government's concession, I now find and conclude that Thompson is entitled to the "safety-valve" exception, including the two-point reduction provided for under U.S.S.G. § 2D1.1(b)(4) (effective November 1, 1995) (applying U.S.S.G. § 5C1.2(1)–(5)). *See United States Sentencing Commission Amendments to the Sen-*

268

268 *tencing Guidelines,* Amendment 515 (Oct. 2, 1995). This means that without any departure Thompson's sentence is driven by the Guidelines rather than the statutory minimum penalty, and further, that the offense level calculation made by the probation officer should be reduced by two points since the officer was unaware of the recent amendment to the Guidelines.

Thus, without a departure, but after application of the "safety-valve" exception: (1) the total offense level is 27; and (2) the criminal history category is I. In turn, this provides a sentencing range of 70–87 months, as opposed to the statutory minimum sentence of 120 months. *Compare Thompson,* 905 F.Supp. at 677.

With regard to the departure question, I now find and conclude that Thompson is not entitled to a departure under U.S.S.G. § 5K2.0, p.s. Central to my earlier belief that Thompson was entitled to a departure was my erroneous conclusion that she was "vastly less culpable than most other individuals who distribute 'crack' or 'powder' cocaine." *Thompson,* 905 F.Supp. at 678. The facts have changed.

The evidence presented at the evidentiary hearing presented new information about her experience with "crack" cocaine. The government proved that in 1993 Thompson told police that she had sold crack cocaine in 1991 to raise money. (Ev. Hr'g Tr. 97:21–25; 98:1–3). There is therefore no doubt that Thompson had prior experience *personally selling* "crack." In turn, this evidence suggests that Thompson's participation in the instant offense was not the product of naivete, notwithstanding the fact that she has no prior criminal history.

In another interview after the evidentiary hearing (Filing 553, attachment)[1], Thompson provided the following new information: (a) she had delivered two or three packages containing drugs for "mailing" to Nebraska in addition to the one which formed the basis of the instant offense; (b) regarding one of the packages that she delivered *prior* to the one forming the predicate for the instant

charge, she "assumed [it] had crack/cocaine in it" because of the weight of the package; and (c) she knew a great deal about the Nebraska–California "crack" distribution ring, which forms the basis for the instant charges, because she was personally present when the conspirators "put together a plan for Eric Moore to come to Lincoln and sell drugs." This evidence conclusively establishes that Thompson was significantly more involved in the underlying "crack" conspiracy than I had originally understood.

None of this information was available to me when I issued the notice of intent to depart. It is now obvious to me that Thompson is *not* vastly less culpable than other individuals who have dealt in "crack" or "powder" cocaine, and a departure is unwarranted.

There is an issue lurking in this case that I should resolve directly. Much of the evidence which supports application of the "safety-valve" exception in favor of Thompson comes from Thompson and is derived from statements she gave to the police as she endeavored to comply with her obligation under U.S.S.G. § 5C1.2(5) to "truthfully provide[ ] to the Government all information and evidence the defendant has concerning the offense...." In turn, the same evidence (Thompson's statements) prove that while she is entitled to application of the "safety-valve" exception, she is not entitled to a downward departure.

Must the court consider her statements for one purpose, but ignore her statements for another? For four related reasons, I believe the answer to this question is "no."

First, the court could not grant Thompson the benefit of the "safety-valve" exception *without consideration* of her admissions to law enforcement officers. Section 5C1.2(5) explicitly requires the court to determine whether and to what extent she cooperated with the government. It would be irrational to require the court to consider Thompson's statements for purposes of determining the applicability of the "safety-valve," while at the same time requiring the court to ignore

---

1. In her brief Thompson states that she "does not object to the court's taking judicial notice of" the

summary of her most recent interview. (Def's Sent.Mem. at 2 (Apr. 11, 1995).) I will do so.

those statements when determining the closely related question of whether the court should depart downward under the Guidelines.[2]

Second, the Guidelines specifically contemplate use of the information Thompson provided when "determining the applicable guideline range...." U.S.S.G. § 5C1.2(5), comment. (n. 7). That is: "Information disclosed by the defendant with respect to subdivision (5) may be considered in determining the applicable guideline range, except where the use of such information is restricted under the provisions of § 1B1.8 (Use of Certain Information)."

■ Third, U.S.S.G. § 1B1.8 does not apply to Thompson's statements. This section of the Guidelines prohibits use of certain inculpatory statements for sentencing purposes when a defendant "agrees to cooperate" against "others." In order for there to be a "cooperation agreement" within the meaning of U.S.S.G. § 1B1.8, there must be three elements shown to exist: (a) an agreement with the government; (b) to provide information against others; (c) which contains a provision that self-incriminating information provided pursuant to the agreement will not be used against the defendant. U.S.S.G. § 1B1.8(a).

The only "agreement" in this case which even approaches a "cooperation agreement" was a "proffer agreement." However, this agreement explicitly states that it is not a cooperation agreement, but rather an agreement to permit negotiations for a cooperation agreement by allowing the police to interview Thompson (Ex. 6A ¶¶ 3 & 4). Even more importantly, in that agreement the government promised only one thing: not to use Thompson's statements "as part of the government's case in chief in any criminal prosecution of Subject...." (Ex. 6A ¶ 5.) Obviously, Thompson's statements were not offered "as part of the government's case in

chief" since the statements were considered only within the context of a sentencing dispute about whether Thompson should be treated more leniently than called for under normal application of the Guidelines.

■ More than two years after the "proffer agreement," the parties did enter into a "plea agreement." (Filing 438, attachment). In that agreement Thompson agreed to plead guilty to an information; she agreed to forfeiture of money; the government agreed to recommend a three-point reduction for acceptance of responsibility; and the parties agreed that Thompson's involvement regarding "crack" was between 150 and 500 grams. (Filing 472 at 16:12–18:8 (transcript of plea)).

In the "plea agreement," the government agreed that "information provided by defendant, *which is not otherwise available to the government,* shall not be used against defendant for sentencing pursuant to 1B1.8 of the Sentencing Guidelines." (Filing 438, attachment ¶ 3) (emphasis added).)[3] *However, before acceptance of the plea both parties explicitly advised the court that there was no cooperation agreement as a part of the plea agreement in which Thompson agreed to provide information against other people.* (*Id.* at 17:23–25; 18:1–8). An examination of the wording of the "plea agreement" confirms these representations. (Filing 438, attachment). Therefore, the plea agreement standing alone does not invoke the provisions of U.S.S.G. § 1B1.8. This is true because the Guideline commentary makes clear that: "Unless the cooperation agreement relates to the provision of information concerning the *unlawful activities of others,* this guideline does not apply...." U.S.S.G. § 1B1.8, comment. (n. 6).

Furthermore, since there was no "cooperation agreement" contained within the "plea agreement" (as defined under U.S.S.G. § 1B1.8), the proviso in paragraph three of the "plea agreement," which is specifically predicated upon application of U.S.S.G.

---

2. Whether a court could consider such information to impose a more harsh sentence than otherwise called for under normal application of the Guidelines poses a much different question.

3. Because there was a plea agreement (although no "cooperation agreement" within the meaning of U.S.S.G. § 1B1.8), Thompson's statements be-

fore or after the plea agreement are not rendered inadmissible by Fed.R.Evid. 410 or Fed. R.Crim.P. 11(e)(6). *See* U.S.S.G. § 1B1.8, comment. (n. 3). These rules restrict use of inculpatory statements at sentencing where *no* plea agreement is reached. *Id.*

§ 1B1.8, did not shield statements Thompson made pursuant to the "proffer agreement." As earlier established, these statements were "otherwise available to the government" under U.S.S.G. § 1B1.8 and the "proffer agreement" for purposes of determining whether Thompson should be treated more leniently than normal under the Guidelines.

Simply put, neither the "proffer agreement" nor the "plea agreement" was a "cooperation agreement" within the meaning of U.S.S.G. § 1B1.8. Moreover, the government only promised one thing regarding use of her statements: it would not use her statements against her in its "case in chief." As a result, the court was free to use Thompson's statements when "determining the applicable guideline range" in the context of deciding whether that range should be decreased from the range normally called for under the Guidelines. U.S.S.G. § 5C1.2(5), comment. (n. 7).

■ Fourth, even if there was a "cooperation agreement" within the meaning of U.S.S.G. § 1B1.8, the commentary to that guideline makes clear that "a court may refuse to depart below the applicable guideline range on the basis of such information." U.S.S.G. § 1B1.8, comment. (n. 1). Although the commentary has specific reference to a motion for downward departure by the government under U.S.S.G. § 5K1.1 regarding substantial assistance to authorities, there is no reason to restrict the applicability of the commentary to only 5K1.1 downward departure questions, as opposed to other downward departure questions.

In summary, there are four reasons why the court should be permitted to use Thompson's statements to grant her the benefit of the "safety-valve" adjustment, but deny her a downward departure:

(1) It would be irrational to require the court to consider Thompson's statements for purposes of determining the applicability of the "safety-valve" as explicitly required by U.S.S.G. § 5C1.2(5), while at the same time requiring the court to ignore those statements when determining the closely related question of whether the court should depart downward under the Guidelines.

(2) The Guidelines specifically contemplate use of the information Thompson disclosed regarding the question of her entitlement to the "safety-valve" when "determining the applicable guideline range. . . ." U.S.S.G. § 5C1.2(5), comment. (n. 7).

(3) U.S.S.G. § 1B1.8 does not apply to Thompson's statements because: (i) Thompson never entered into an agreement to cooperate against others with the government, and (ii) the government promised only that it would not use her statements "as part of the government's case in chief."

(4) Even if there was a "cooperation agreement" within the meaning of U.S.S.G. § 1B1.8, the commentary to that guideline makes clear that "a court may refuse to depart below the applicable guideline range on the basis of such information." U.S.S.G. § 1B1.8, comment. (n. 1).

Accordingly,

IT IS ORDERED that:

1. The government's objection (Filing 487) is sustained in part and denied in part;

2. Thompson is entitled to the benefit of U.S.S.G. § 2D1.1(b)(4) and U.S.S.G. § 5C1.2(1)–(5), but not a departure under U.S.S.G. § 5K2.0, p.s.;

3. Without a departure, but after application of the "safety-valve" exception: (a) the total offense level is 27; (b) the criminal history category is I; and (c) the sentencing range is 70–87 months.